# MARGARET LEONA PUGH

## *vs.*

# THE WASHINGTON RAILWAY AND ELECTRIC COMPANY, a Corporation.

*Railway consolidation: negligence; liability of operating corporation. Conductor's duty to protect passengers.*

Through the consolidation of one railway company with another, the same officers and directors controlled both lines, employed the conductors for both lines, and there was no public evidence of any separate existence of the distinct companies, although the receipts and expenses were separately entered up and charged as a mere matter of bookkeeping; to a passenger who was assaulted while on one of the cars, so operated, the operating company was held liable.                          p. 206

It is the duty of a conductor of a railway car to protect passengers from assault and insulting language, so far as he reasonably can.                          .          p. 205

*Decided March 6th, 1919.*

Appeal from the Circuit Court for Montgomery County. (Peter and Worthington, JJ.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS and URNER.

*John A. Garrett* and *C. W. Prettyman,* for the appellant.

*William H. Talbott* and *S. R. Bowen,* for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is a suit by the appellant against the appellee based on the claim, as alleged in the declaration that, while "she was a passenger on a car operated by the defendant she was insulted by indecent remarks and gestures from other persons on the said car, and her person assaulted by one of the other persons upon the said car." It is alleged that the "conductor in charge of said car, before and during and while the said assault was in the act of being committed, was requested and urged by the plaintiff and a male acquaintance, who took her under his protection, to cause the said assault to cease and to prevent further insult and injury, but that the said conductor laughed at her terror and made no attempt to protect her from injury and insult, but rather by his conduct encouraged the same," etc.

The case was tried under the general issue plea, and a verdict was rendered for the defendant in accordance with the following instruction: "The Court instructs the jury that there is no evidence in this case legally sufficient to show that the car mentioned in the evidence was, at the time of the assault complained of, operated or controlled by the defendant, or by its servants, agents or employees, and that therefore their verdict must be for the defendant." This appeal is from a judgment rendered on the verdict thus directed.

The proceedings were unusual, but if the Court was right in its conclusion that there was not legally sufficient evidence to show that the defendant was responsible for what was complained of, it was proper to bring the case to an end and then, instead of occupying the time of the Court with other ques-

tions and afterwards granting such an instruction as this at the conclusion of all the testimony. The important question, therefore, is whether the Court was right in the conclusion reached by it from the evidence offered. That makes it necessary for us to ascertain from the record the precise relations existing between the two companies—the one we will speak of as the Georgetown Company and the appellee—and then to determine whether the appellee can be held liable in this action.

Mr. Bowen, one of the attorneys for the appellee, was called by the appellant and his testimony is the principal evidence in the record—that of Mr. Smoot, the other witness, adding very little to what Mr. Bowen said, who testified that he was secretary of both of those companies in March, 1917, when the trouble complained of occurred; that he was also secretary of the Potomac Electric Company, the City & Suburban Railway of Washington, the Washington & Glen Echo Railroad Company, the Washington & Rockville Railway Company and the Washington, Woodside & Forest Glen Railway & Power Company, but the last is now merged with the Washington & Rockville Railroad Co.; that the Georgetown Company operated the line or route which was given to it by an Act of Congress on Wisconsin avenue or 32d street between 32d and M streets and the District Line; that the appellee is composed of what at one time was the Washington & Great Falls Company, which started at 24th and Prospect streets and ran to the District.Line towards Cabin John, also the Maryland Company that runs from the District Line to Cabin John, what was formerly the Metropolitan Railway Company, the Columbia Railway Company, the Anacostia and Potomac River Railroad Company, and the Brightwood Railroad Company. He said that those companies were consolidated with the appellee under the provisions of the Act of Congress approved June 5, 1900, but that the Georgetown Company had not been consolidated with it and "was a separate entity, a separate corporation in every respect. The relation merely of the Washington Railway & Electric Com-

pany to the Georgetown & Tenleytown Company is that of a
stockholder." We do not find in the record the precise rela-
tion the City & Suburban Railway bore to the appellee. Mr.
Bowen testified that he was secretary of the six companies
named above, including the City & Suburban, but he did not
mention that as one of those included in the consolidation or
state whether it includes any of those named as consolidated.
He testified that the Georgetown Company purchased its
electric current from the appellee and "If a car on the George-
town and Tenleytown Company was damaged and needed re-
pairs it would be sent to the common shops of the company.
"Q. Of what company? A. Of the companies, the system,
and the work that was put on that car charged to the com-
pany who is using the car under lease or was operating the
car at the time of the damage." He further testified that the
directors and officers of the Georgetown Company and of the
appellee are the same individuals, that those individuals, act-
ing as officers and directors of both companies, meet in the
City of Washington at 14th and C streets in a building
owned by the Potomac Electric Power Company and each
company is charged its proportion of rent by the Potomac
Company, and the treasurer of the Georgetown Company is
the same individual as the treasurer of the Potomac Com-
pany; that the appellee controls the stock of the Potomac
Company and the officers are the same individuals as those
of the appellee. He said that separate minutes are kept in
separate books of each company, that the clerks in the secre-
tary's office are paid by each company and the proportion of
time they devote to each company's business, but after all the
above is accepted as true, and there is nothing to the contrary
except a possible difference in the interpretation of some of
the evidence and inferences to be drawn from it, there is yet
to be mentioned an important addition to Mr. Bowen's evi-
dence, and that is that it is admitted there is what is spoken
of as the Washington Railway and Electric Company Sys-
tem, which embraces all of these companies which at least in
a sense, if not unqualifiedly, can be said to work together in

the railway business in and near Washington City. We find that throughout the record. Apparently offering some stationery which does not appear in the record, counsel for the appellant asked Mr. Bowen: "That is some of the stationery of the Washington Railway and Electric Company? "A. The Washington Railway and Electric Company System, yes. Q. On the stationery of the Washington Railway and Electric Company System, you have the Georgetown and Tenleytown Company there, have you not? A. Yes, sir." Then, when a pass to one of the attorneys was produced Mr. Bowen explained: "This is described an emplo*yee's* (record has emplo*yer's*) pass, good on all lines of the companies included in the Washington Railway and Electric Company System." Then follow these significant questions and answers: "Tell me what that means the Washington Railway and Electric Company System? A. The Washington Railway and Electric Company System in legal significance I would not know that it has any special meaning; in operating significance it would have to this extent that that would entitle a holder of that pass to ride over certain lines with which the Washington Railway & Electric Company may have contracts for the exchange of traffic or the interchange of traffic, without indicating at all what are the particular lines that might be operated by one company or another. Q. Is that pass good on the Georgetown and Tenleytown and the Washington and Rockville Railroad Companies? A. If tendered on the line of the Georgetown and Tenleytown Railway Company between 32d and M streets and the District Line, it would be accepted. Q. What company issues that pass? A. That would be issued, as the pass indicates by the Washington Railway and Electric Company System. Q. And the Georgetown and Tenleytown Railroad Company is part of the system? A. It is in the sense that I have stated."

All of the conductors and motormen wore the same uniforms and they carried the books of rules promulgated by that system for their guidance and direction. The cars run from Rockville to 32nd and M streets in Washington over

the Georgetown lines without change, and there is a continuous line of tracks.   Nothing whatever appears in the record which would inform the public or suggest to the passengers that when they reached the District line they were under the control of a different company from the one with which they started.   It is not shown in the record whether the plaintiff had a ticket, but it is admitted in terms that she was a passenger from Rockville to Washington, and we understand it to be conceded that she had paid her fare as the declaration alleges.   There is nothing to the contrary, and unless that was conceded, or the contrary admitted, the Court would not have acted on the prayer without some evidence on the subject.   It was also stated by Mr. Bowen that Mr. J. T. Moffett was superintendent of transportation and Mr. Stevens was superintendent of both companies; that the City and Suburban Railway owned some of the cars operated on the Georgetown Railroad and the appellee leases some to the Georgetown Company, for which a charge per car per day is made.   It is not stated that the Georgetown Company owned any cars of its own, and the inference seems to be to the contrary.   This appears in the evidence: "Q. Who owns these large cars that run to Rockville over the lines of the Georgetown & Tenleytown Railroad Company?    A. There are certain cars that are owned by the Washington & Rockville Railroad Company that when they reach the District line are then taken over by the Georgetown & Tenleytown Railroad and operated by them as far as the Georgetown & Tenleytown line runs.   Q. But I mean which company actually owns these big cars, these cars that come out here?   A. The Washington & Rockville Railroad Company owns certain cars, and it may be—I am giving my best recollection— that the Washington & Rockville may lease some cars from the Washington Railway and Electric Company.   I won't be positive about that.   Q. And the Georgetown & Tenleytown Railway Company leases cars from the Washington Railway & Electric Company?   A. And from the City & Suburban Railway."

The evidence of Mr. Smoot does not throw any special light on the subject beyond what Mr. Bowen explained. He was a day clerk employed at the office of "the Washington & Tenleytown Railway Company," as he speaks of it. He was originally a conductor, and was employed by Mr. J. T. Moffett, superintendent of transportation. The money received by conductors was turned in together, but the accounts were kept separate and afterwards apportioned to the different companies, according to the hours the men worked. We understand the evidence to be that there was what was called a division superintendent of the Georgetown Company whose duties did not extend beyond the District line. That is not perfectly clear, but we will assume it to be so.

The substance of Mr. Bowen's evidence is that the Georgetown Company is a separate entity from the appellee, but the actual relations between the two companies are shown by what we have stated above. There is nothing whatever in the evidence to show that there was any notice to the public or to the passengers on either road that there was any distinction between the operation of the Georgetown Company and that of any other company in the system. It was largely a matter of bookkeeping, and, although the law is liberal in reference to the consolidation of and traffic arrangements between railroad companies, the public interests must not be lost sight of. The description of the same men acting as directors and officers of the several companies, sitting in the same building (if not the same room) owned by a company which was controlled by the appellee, using the same clerks and having the same secretary, and with the same conductors and motormen running the cars on both roads (with nothing to indicate, so far as disclosed by the record that any of the cars belonged to the Georgetown Company), and reporting to their superiors in that building, who one minute represented the appellee and the next the Georgetown Company, would not be very convincing evidence, to either layman or lawyer, of such a distinction between the two companies as to suggest that it was necessary for one seeking redress for

alleged injuries on one of the cars which ran on both roads, in continuous trips, to first delve into the intricacies of railroad bookkeeping in order to ascertain whether he should sue the one or the other company, especially if the injured one was not certain whether the injury occurred on the one side or the other of the District line.   To those not knowing of the double capacities in which the directors, officers and agents served, as described in the evidence, the outside appearance would be even more misleading, not to say deceptive.

This case is of more importance than the mere question whether the appellant sued the wrong company, as the rights of the public are involved.   Of course, the fact that the appellee owned the majority of the stock of the Georgetown Company could not of itself make it liable for injuries sustained on the railway of the latter company, but it is a circumstance which can not be overlooked in connection with some of the evidence.   For example, the question was asked whether the appellee could not, by reason of its having control of the majority of the stock, employ anyone that it wanted to go on the Georgetown road, and the reply was, "No"; that it had no control over the operation of the Georgetown Company, except to the extent of voting its stock for the directors. As what might be called a legal fiction, that might be correct; but, as the evidence shows that the same individuals are directors and officers of both companies, greater control could not well be suggested.   Take the conductor who is complained of in this case for illustration; could it be said that the appellee could not have controlled his employment?   The same conductor took the car through over both railways, and if the officer when acting for the appellee had refused to appoint him, certain it is that he would not have appointed him when acting for the Georgetown Company, if he was himself a competent officer.

If there were no authorities on the subject, it seems to us that the facts when carefully analyzed and considered must lead to the conclusion that the appellee is liable to the appellant if the occurrence complained of is proven to be as

alleged, but there are many authorities applicable to the questions presented by the record.    The English courts have adopted the rule that the sale of a passenger ticket by a railroad company over its own and connecting roads was evidence of a contract for through transportation to the point of destination, and the company making the sale was responsible for the entire journey; 5 R. C. L. 153, sec. 779; 10 C. J. 818, sec. 1259.   While some courts in this country followed the English decisions the majority have not done so, as will be seen by reference to the same pages in those works and the notes.   The quotations from 6 Cyc. 571 and 584 in Mills v. B., C. & A. Ry. Co., 111 Md. 260, would seem to place this State in the latter class, although that case is not wholly in point.   If, however, the carrier contracts as principal to carry a passenger to a destination over its own line and a connecting line, it will be liable for injuries sustained by reason of the torts or negligence of the connecting carrier while completing the contract of transportation; 5 R. C. L. 155, sec. 780.   It is there said that, "Where the lines of several railroad corporations are conducted as a single system for the purposes of the traffic between different points originating upon either, the corporations may constitute themselves a partnership for the business of such traffic; and when they do, although the general management of each road is retained by the corporation owning it, the several corporations are, as to such business, partners, and liable upon the principles of the law of agency."   One of the cases cited in that section, while not wholly analogous to this one, illustrates the tendency of the courts to protect passengers where there are continuous systems or companies acting jointly with each other. We refer to Mullen v. Chester Traction Co., 235 Pa. 516, 84 At. 429.   The facts of that case might well be fully stated, but we will content ourselves with simply referring to it.

In 10 C. J. 820 it is said: "Where the contract of the carrier selling the ticket is for through transportation, it is the principal, and the connecting carrier continuing the transportation of the passenger under such ticket is the agent of the

carrier selling the ticket for the purpose of carrying out the contract of transportation, and in such case the carrier selling the ticket will be liable for any fault of the connecting carrier or its employees." On page 877 of that volume the general rule is recognized that one carrier is not liable for injuries to a passenger when it does not own or control the track or car at the time of the injury, but the author adds: "Although the passenger is not bound by a secret arrangement between the carrier with which he contracts and another carrier, under which the other carrier has exclusive control of the car in which the passenger is riding, and of which arrangement he has no notice."

Applying these principles to this case, we are of the opinion that there was error in granting the prayer referred to, holding that the defendant company was not responsible. There is nothing in this record to suggest that the plaintiff had any reason to suppose that some other company was operating the car, or was alone responsible for injuries sustained by her. When tickets are issued with coupons attached, the passenger can see that he is to be carried on some other road, and generally there is a limitation of liability on the face of the ticket. In this case it does not appear that there was a ticket, but the fare was paid. There was in fact no change of officers on the car and simply because the conductor and motorman were to be paid from the District line to the end of the run in Washington by the Georgetown Company cannot relieve the defendant. Without holding that the two companies were strictly speaking partners, they were of that nature and in a sense joint operators. It was the duty of that conductor to protect his passengers from assault and insulting language as far as he reasonably could, and the defendant was just as much responsible for that conductor being in charge of the car as the Georgetown Company was, for at most it was a joint employment of him by the two companies. If the injury complained of had been the result of the condition of the tracks and the Georgetown Company

was alone under obligation to keep them in repair, there might be more ground for the appellee's position, although we are not to be understood under the circumstances of this case as so deciding, but to say that one company can accept the transportation of a passenger with the obligation which rests upon it to have men in charge of its cars who use reasonable care to protect the passengers from insult or assault by other passengers and be relieved of that obligation as soon as the car gets on the road of another line, although the same men continue in charge of the car, would under the circumstances of this case be carrying the rule of law applicable to connecting companies beyond what the traveling public should be subjected to.

We are then constrained to differ with the learned judges below and will reverse the judgment.

> *Judgment reversed and new trial awarded, the appellee to pay the costs.*